IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

ERIC JONES, ET AL.                          :
                                            :
                                            :
        v.                                  :        CIVIL NO. CCB-05-1287
                                            :
SUSAN MURPHY, ET AL.                        :
                                            :
                        ...o0o...

## MEMORANDUM

The plaintiffs in this case bring constitutional claims against the Mayor and City Council

of Baltimore ("City"), the Baltimore City Police Department ("BPD"), collectively "the City

defendants,"[1] and current and former wardens[2] ("Wardens") of the Central Booking and Intake

Center ("CBIC"), collectively "the State defendants,"[3] for alleged mistreatment of people

arrested and taken to CBIC for booking and processing.  The plaintiffs allege two general areas

of unconstitutional treatment of arrestees while at CBIC: strip searches and "over detention".

Three motions are now pending before the court: (1) the City defendants' motion to dismiss the

third amended complaint; (2) the State defendants' motion to dismiss the third amended

complaint or alternatively for summary judgment; and (3) the plaintiffs' motion to deny the State

defendants' motion for summary judgment or alternatively to permit discovery.  These motions

---

[1] The plaintiffs include other police agencies under the City's control, such as the
Baltimore City Housing Police, in this suit.  (3d Am. Compl. ¶ 97.)

[2] The current warden, Mitchell Franks, is sued in his individual and official capacities,
(3d Am. Compl. ¶ 86), except with respect to the over detention claims, for which he is sued in
his official capacity only (Pls.' Opp'n State Defs.' Mot. Dismiss 3d Am. Compl. at 2, n.1).
Former wardens Susan Murphy and William Jednorski are sued in their individual capacities.
(*Id.* at  ¶¶ 87-88.)

[3] CBIC is an agency of the Maryland Division of Pretrial Detention and Services. (3d
Am. Compl. ¶ 99.)

have been fully briefed, and pursuant to Local Rule 105.6, no hearing is necessary.  For the reasons set forth below, the State defendants' motion will be treated as a motion to dismiss and will be denied, with certain exceptions; the City defendants' motion to dismiss will be granted in its entirety.

## BACKGROUND

The plaintiffs bring this case as a class action, with a proposed class period of May 12, 2003 until final judgment in this case, although no motion for class certification has yet been filed.  There are eight named plaintiffs: (1) Eric Jones, arrested for second degree assault and false imprisonment (3d Am. Compl. ¶ 33); (2) Dana West, arrested for leaving the scene of an accident (*id.* at ¶ 25); (3) Gary Saunders, who has multiple arrests during the proposed class period, including but not limited to misdemeanor theft, trespassing, and open alcohol containers, and has been arrested more than fifty times since CBIC opened in 1995 (*id.* at ¶¶ 50-51); (4) Anthony Haig, who was arrested for re-selling Orioles tickets and failed to appear for his court hearing, thus there is an active bench warrant for his arrest (*id.* at ¶¶ 60, 69); (5) Michael Washington, arrested for public urination[4] (*id.* at ¶ 70); (6) Kevin Adams, arrested for an open alcohol container (*id.* at ¶ 79); (7) Tonia Bowie, arrested for driving with a suspended license (*id.* at ¶ 42); and (8) David Colyns, arrested for possessing a pocket knife and needle paraphernalia (*id.* at ¶ 46).

The plaintiffs propose five classes: (1) the suspicionless strip search[5] class, consisting of

---

[4] The third amended complaint inadvertently mischaracterized this offense as an open alcohol container.  (Pls.' Opp'n State Defs.' Mot. Dismiss 3d Am. Compl. at 6 n.4.)

[5] The plaintiffs define "strip search" or "full strip search" as "the removal, pulling down, or rearrangement of clothing for the visual inspection of an arrested person's genital and/or anal

those who have been or will be arrested for crimes not involving weapons, drugs, or felony violence, who were strip searched by CBIC employees without any individualized finding that they were harboring weapons, drugs, or other contraband[6] (*id.* at ¶ 9); (2) the non-private strip search class, consisting of those who have been or will be subjected to strip searches at CBIC with other arrestees present[7] (*id.* at ¶ 12); (3) the equal protection strip search class, consisting of male arrestees strip searched at CBIC while female arrestees are not[8] (*id.* at ¶ 14); (4) the underwear strip search[9] class, consisting of male arrestees subjected to an underwear strip search while at CBIC while female arrestees are not[10] (*id.* at ¶ 16); and (5) the over detention class, consisting of those arrested without warrants who have been or will be detained for an unreasonable length of time (more than 48 hours) before presentment to a judicial officer for a determination of probable cause[11] (*id.* at ¶ 18).  Plaintiff Eric Jones also brings an individual claim against former Warden Murphy and the City defendants based on being detained for more than 36 hours prior to presentment.  (*Id.* at ¶¶ 346-47, 358.)

---

areas, which may also include requiring the person to squat and cough, in the presence of one or more guards."  (3d Am. Compl.¶ 8.)

[6] Represented by named plaintiffs West, Jones, Saunders, Haig, and Washington.

[7] Represented by named plaintiffs West, Jones, Saunders, Haig, and Washington.

[8] Represented by named plaintiffs West, Jones, Saunders, Haig, and Washington.

[9] The plaintiffs define "underwear strip search" as "a strip search to the person's underwear, without removing or rearranging the underwear for visual inspection of bare skin thereunder."  (3d Am. Compl. ¶ 8.)

[10] Represented by named plaintiff Adams.

[11] Represented by named plaintiffs Bowie, Colyns, Saunders, Washington, Haig, and Adams.  A recent suit in state court, *Rodney, et al. v. Murphy*, case no. 24-C-05-004405, also challenged over detention practices, which seem to have improved as a result.

Each class, as well as Plaintiff Jones, brings claims against both the State and City defendants.  The plaintiffs' general theories are as follows: CBIC has both a policy and a practice of unconstitutional strip searches, as well as a practice of unconstitutional over detentions.  The State defendants are liable both for establishing this policy and for being deliberately indifferent to their staff's unconstitutional practices.  (*Id.* at ¶¶ 151-65, 173-81.)  These constitutional violations were and are known to City defendants, who nonetheless have continued to transport arrestees there rather than pursuing alternatives, such as issuing citations for minor offenses instead of making arrests. (*Id.* at ¶¶ 127, 165-72, 182-86.)  Such aggressive arrest policies and practices result in large numbers of arrestees being taken to CBIC, thereby exacerbating its already overcrowded conditions.  (*Id.* at ¶¶ 110-18.)  The City defendants are thus liable under a theory of "entrustment liability", as they have placed arrestees into the custody of an entity where the constitutional violations were known to them.  (*Id.* at ¶¶ 167-72, 182-86.)

All claims are brought under 42 U.S.C. § 1983, and the plaintiffs seek both damages and equitable relief.  Claims against the State defendants regarding suspicionless strip searches, non-private strip searches, and over detentions (Counts 1, 2, 4, 9[12]) allege violations of the Fourth Amendment.  (*Id.* at ¶¶ 251, 264, 291, 351.)  Claims against the City defendants in these areas (Counts 5, 6, 8,10), allege violations of the Fourth and Fourteenth Amendments.  (*Id.* at ¶¶ 311, 322, 344, 366.)  Equal protection claims[13] against the State defendants  (Counts 3, 11) are

_____

[12] Count 9 is just against Warden Murphy in her individual capacity.

[13] Note that these encompass both the allegations of the equal protection class and the underwear strip search class, named as such by the plaintiffs to avoid confusion.  (3d Am. Compl. at 8, n.1.)

4

brought under the Fourteenth Amendment (*id.* at ¶¶ 285, 378), while equal protection claims

against the City defendants (Counts 7, 12) are brought under the Fourth and Fourteenth

Amendments (*id.* at ¶¶ 333, 391).

## ANALYSIS

"The purpose of a Rule 12(b)(6) motion is to test the sufficiency of a complaint;

importantly, a Rule 12(b)(6) motion does not resolve contests surrounding the facts, the merits of

a claim, or the applicability of defenses." *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th

Cir. 1999) (internal quotation marks and alterations omitted).  When ruling on such a motion, the

court must "accept the well-pled allegations of the complaint as true," and "construe the facts

and reasonable inferences derived therefrom in the light most favorable to the plaintiff." *Ibarra*

*v. United States*, 120 F.3d 472, 474 (4th Cir. 1997).  Consequently, a motion to dismiss under

Rule 12(b)(6) may be granted only when "it appears beyond doubt that the plaintiff can prove no

set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355

U.S. 41, 45-46 (1957); *see also Edwards*, 178 F.3d at 244.  To survive a motion to dismiss,

however, a complaint must "in light of the nature of the action . . . sufficiently allege each

element of the cause of action so as to inform the opposing party of the claim and its general

basis." *Chao v. Rivendell Woods, Inc.*, 415 F.3d 342, 348 (4th Cir. 2005).  In addition, because

the court is testing the legal sufficiency of the claims, the court is not bound by the plaintiff's

legal conclusions.  *See, e.g., Young v. City of Mount Ranier*, 238 F.3d 567, 577 (4th Cir. 2001)

(noting that the "presence . . . of a few conclusory legal terms does not insulate a complaint from

dismissal under Rule 12(b)(6)" when the facts alleged do not support the legal conclusions).

**State Defendants' Motion to Dismiss or Alternatively for Summary Judgment**

*Strip Search Claims (Fourth & Fourteenth Amendment Violations)*

The strip search claims are not subject to dismissal, as the plaintiffs state claims for

which relief could be granted.[14]  *See Amaechi v. West*, 237 F.3d 356, 364-65 (4th Cir. 2001)

(holding unconstitutional the strip search of an arrestee for a noise violation who did not pose a

danger to the officers) (citing *Logan v. Shealy*, 660 F.2d 1007, 1013-14 (4th Cir. 1981) (holding

blanket strip search policy regardless of underlying offense unconstitutional and deciding that

"as a matter of law, no police officer in this day and time could reasonably believe that

conducting a strip search in [a non-private area] . . . is a constitutionally valid [search].")); *Mary*

*Beth G. v. City of Chicago*, 723 F.2d 1263, 1274 (7th Cir. 1984) (strip searching all women but

not similarly situated men violates Equal Protection Clause).

*Over Detention Claims (Plaintiff Jones and Named Plaintiffs)*

Jones now brings individual counts against both the City and State defendants for

unreasonably long detention, alleging that he was held for "at least 36 hours after his arrest

without presentment."  (3d Am. Compl. ¶ 40.)  He is no longer a named plaintiff for the over

detention claims.  (*Id*. at ¶¶ 3-4.)  The six named over detention plaintiffs all allege that they

were detained for more than 48 hours without presentment following their arrests.  (*Id.* at  ¶ 18.)

Both Jones and the named plaintiffs state claims for which relief could be granted; indeed, the

Wardens do not specifically contest this.  *See County of Riverside v. McLaughlin*, 500 U.S. 44,

56-57 (1991) (establishing that presentment within 48 hours of arrest is presumptively

_____

[14] The wardens also argue for summary judgment on these claims; however, it would be premature to consider summary judgment before the plaintiffs have had the opportunity to contest the affidavits upon which the wardens base their arguments for the strip search policy's constitutionality.  (*See* State Defs.' Mot. Dismiss 3d Am. Compl. at 10.)

constitutional but presentment within that time could still be found unconstitutional depending

on the circumstances).

*Supervisory Liability Under §1983*

The Wardens argue that as there is no *respondeat superior* under §1983, their liability for

actions of CBIC employees can only rest upon a supervisory liability theory.  (State Defs.' Mot.

Dismiss 3d Am. Compl.[15] at 8-9.)  Supervisory liability may attach under § 1983 if a plaintiff can

establish:

> (1) that the supervisor had actual or constructive knowledge that his subordinate was
> engaged in conduct that posed "a pervasive and unreasonable risk" of constitutional
> injury to citizens like the plaintiff; (2) that the supervisor's response to that knowledge
> was so inadequate as to show "deliberate indifference to or tacit authorization of the
> alleged offensive practices[]"; and (3) that there was an "affirmative causal link" between
> the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

*Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994) (internal citations omitted).  The Wardens

contend that the plaintiffs' pleading is "devoid of any facts supporting its many conclusory

assertions" regarding the three elements of supervisory liability, thus it should be dismissed for

failing to state a claim.  (State Defs.' Mot. Dismiss at 8.)

 Except in very limited circumstances, "the Federal Rules of Civil Procedure do not

require a claimant to set out in detail the facts upon which he bases his claim," *Conley*, 355 U.S.

at 47, and a complaint need only satisfy the "simplified pleading standard" of Rule 8(a)(2),

*Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 513 (2002).  The Fourth Circuit has construed this

standard as follows: "a complaint meets [Federal Rule of Civil Procedure] 8's requirements if, in

light of the nature of the action, the complaint sufficiently alleges each element of the cause of

---

[15] From here on, all references to any motion, opposition, or reply will be assumed to be
referring to those addressing the third amended complaint unless otherwise indicated.

action so as to inform the opposing party of the claim and its general basis." *Chao*, 415 F.3d at 348.

The plaintiffs have made sufficient allegations of supervisory liability under the Fourth Circuit's requirements to survive this motion to dismiss.[16]   First, the initial element of *Shaw* requires that a supervisor have knowledge (actual or constructive) of his subordinate behaving in a way that posed "'a pervasive and unreasonable risk' of constitutional injury."  13 F.3d at 799 (internal citations omitted).  The subordinate's conduct must be "'widespread'" or, if not, it must have occurred on "'several different occasions'".  *Randall v. Prince George's County*, 302 F.3d 188, 206 (4th Cir. 2002) (internal citations omitted).  Constructive notice can be alleged in multiple ways, including the existence of written reports of conditions at a detention facility, or a supervisor's high level of responsibility coupled with the violations alleged to have occurred on her or his watch.  *See Slakan v. Porter*, 737 F.2d 368, 374-75 (4th Cir. 1984).  In addition to alleging generally that the Wardens had actual and constructive notice, the plaintiffs specifically allege that widespread deficiencies at the facility with respect to booking and managing inmates were documented in a series of reports, newspaper articles, and court cases dating back many years.  (3d Am. Compl. ¶ 131.)  They further note that the City, the Wardens' co-defendant in this suit, characterized CBIC "as 'dysfunctional' and lacking 'appropriate or adequate management systems and practices to assure performance and accountability'" in its complaint in *Rodney*, the state court challenge to over detention at CBIC.  (*Id.* at  ¶ 134.)  The plaintiffs

---

[16] The plaintiffs contend that their alleged facts could make out claims under additional theories, such as "failure to train" or bystander liability.  (Pls.' Opp'n State Defs.' Mot. Dismiss at 18-19.)  Given that the Wardens focus their argument on supervisory liability and that the plaintiffs have sufficiently stated a claim under that theory, it is not necessary to analyze other potential theories at this time.

also thoroughly set out allegations regarding the Wardens' authority and various duties of training, supervising, disciplining, and formulating and implementing policy ( *id.* at ¶¶ 142-46), as well as the widespread violations at CBIC (*id.* at ¶¶ 135, 147-64), thereby alleging constructive notice through this avenue as well.  Therefore, the plaintiffs have pled facts sufficient to satisfy the first element of *Shaw*.

Second, "that the supervisor's response to that knowledge was so inadequate as to show 'deliberate indifference to or tacit authorization of the alleged offensive practices,'" is also sufficiently supported in the third amended complaint.  *Shaw*, 13 F.3d at 799 (internal citations omitted).  Under *Shaw*, "[a] plaintiff may establish deliberate indifference by demonstrating a supervisor's 'continued inaction in the face of documented widespread abuses, '" thus a plaintiff must allege facts supporting known widespread abuse coupled with supervisory non-responsiveness to meet the pleading requirements on these factors.  *Id.* (internal citations omitted).  The plaintiffs have alleged that the abuses were indeed documented and widespread, as discussed with respect to the first *Shaw* factor, and that the Wardens failed to take measures to stop either the over detention or the strip searching despite having the power to do so.  (*See*, *e.g.*, 3d. Am. Compl. ¶¶ 135 (widespread nature of violations), 147-50 (over detention), 151-64 (strip searching)).  Therefore, Plaintiffs have alleged facts sufficient to satisfy this prong of *Shaw*.

Third, "that there was an 'affirmative causal link' between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff," is also adequately supported in the complaint.  *Shaw*, 13 F.3d at 799 (internal citations omitted).  A supervisor "is liable for 'the

natural consequences of his actions.'" *Id.* at 800 (internal citations omitted).[17]  For each alleged

constitutional violation, the plaintiffs allege that the wrongs were inflicted by CBIC staff.  (*See*,

*e.g.*, 3d Am. Compl. at ¶¶ 27-31, 35-40, 43-44, 47-48, 52-58, 61-67, 71-77, 80-84.)  As set forth

in the analysis of the first and second prongs of *Shaw*, the plaintiffs allege that the Wardens had

actual or constructive knowledge of such practices and did not stop them.  There is thus a casual

link alleged between the Wardens' allowing such practices to continue and the constitutional

harms suffered by the plaintiffs as a result of these practices.  The defendants' motion to dismiss

based on failure to state a claim of supervisory liability will thus be denied.

>    *Qualified Immunity*

>    The Wardens also claim qualified immunity with respect to all allegations against them.

Courts should attempt to resolve questions of qualified immunity as early in litigation as possible

in order to spare those shielded by it "from the burdens of litigation".  *Pritchett v. Alford*, 973

F.2d 307, 313 (4th Cir. 1992).  The relevant test requires "(1) identification of the specific right

allegedly violated; (2) determining whether at the time of the alleged violation the right was

clearly established; and (3) if so, then determining whether a reasonable person in the

[government official's] position would have known that doing what he did would violate that

right." *Id.* at 312.  The reasonableness standard here is an objective test.  *Id.*  This analysis must

be done "'at a high level of particularity'",  *see Amaechi*, 237 F.3d at 362 (citing *Edwards*, 178

F.3d at 250-51), thus the court must carefully consider whether each of the five alleged

---

[17] Causation can also be established directly, such as a policy mandating employees to carry out unconstitutional actions against the plaintiff.  *Shaw*, 13 F.3d at 799 (internal citations omitted).  Depending on what is established about CBIC's official policy on strip searching, this avenue of proof might also be available to the plaintiffs.

violations was prohibited by clearly established law such that a reasonable official in the Wardens' position would have known that the alleged policies and actions were unconstitutional.

First, the right of those arrested for offenses not likely to involve weapons or contraband to be free from strip searches without any individualized finding of reasonable suspicion appears to be clearly established.  *See Logan*, 660 F.2d at 1013 (strip searching must be reasonable under the circumstances and was not reasonable when done to arrestee whose offense was not likely to involve weapons or contraband ); *Amaechi*, 237 F.3d at 365 ("because West had no reason to believe that Amaechi posed a danger to the officers, and because Amaechi was arrested for a misdemeanor noise violation, West should have known that his search of Amaechi similarly was unjustified and therefore unconstitutional."); *Abshire v. Walls*, 830 F.2d 1277, 1279-80 (4th Cir. 1987) (citing *Logan* and stating "the standard in this circuit for judging the constitutionality of a strip search of a pre-trial detainee is firmly established").  Even more specifically, it seems clear that it was not objectively reasonable for the Wardens to believe that a *blanket* strip search policy was lawful, especially when their position of authority is considered.  *See Logan*, 660 F.2d at 1013-14 (explaining that "[a]n indiscriminate strip search policy routinely applied to detainees [whose underlying offense is unlikely to involve weapons or contraband] cannot be constitutionally justified . . ." and distinguishing the reasonableness of a policy-setting sheriff having believed a policy to be constitutional from that of an implementing deputy).  *See also Smith v. Montgomery County*, 643 F. Supp. 435, 439-43 (D. Md.1986) (holding that strip searching "all felony arrestees, and all temporary detainees arrested for misdemeanor offenses that involve weapons or contraband" was constitutional but explaining that blanket strip search policy regardless of underlying offense was unconstitutional).

11

Second, being strip searched in a non-private setting also violates what appears to be a clearly established right in the Fourth Circuit, and it was not reasonable for the Wardens to believe otherwise. *See Amaechi*, 237 F.3d at 364 ("we have repeatedly emphasized the necessity of conducting a strip search in private.").

Third, the right of males to be free from being strip searched (either fully or down to their underwear) while similarly situated females are not appears to be clearly established. Although there is no Supreme Court or Fourth Circuit case directly on point, this does not mean that the right cannot be clearly established, as the defendants suggest it does. (State Defs.' Mot. Dismiss at 18.) A right can be clearly established if it is "'manifestly included within more general applications of the core constitutional principle evoked.'" *Waterman v. Batton*, 393 F.3d 471, 476 (4th Cir. 2005) (quoting *Pritchett*, 973 F.2d at 314). Whether a right has been clearly established, either through cases directly on point or by being encompassed within a core principle, may be found by looking either to "controlling authority in the jurisdiction in question or . . . a 'consensus of cases of persuasive authority such that a reasonable officer could not have believed that his actions were lawful.'" *Waterman*, 393 F.3d at 476 (quoting *Wilson v. Layne*, 526 U.S. 603, 617 (1999)).

First, there are cases from other jurisdictions that have addressed the issue of strip searching one gender but not the other and have agreed that it is unconstitutional. *See Mary Beth G.*, 723 F.2d at 1273-75 (rejecting the city's purported rationales for strip searching women but not men); *Ford v. City of Boston*, 154 F. Supp. 2d 131, 150-51 (D. Mass. 2001) (holding that government failed to meet its burden for gender-based classification, citing *Mary Beth G.*); *see also Gary v. Sheahan*, 1998 WL 547116 *5-10 (N.D. Ill. 1998) (not reported) (finding policy of

12

strip searching women only violated Equal Protection Clause and ordering defendant to adopt remedy, citing *Mary Beth G*).  These cases may be said to constitute a "consensus of persuasive authority".

The second, and arguably stronger, approach given the relatively small number of cases specifically on this topic, is that taken recently by the United States District Court for the District of Columbia in which the right to be free from gender-based strip searches was found to be clearly encompassed by equal protection principles set out in controlling cases.[18]  In *Johnson, et al. v. District of Columbia, et al.*, 2006 WL 3313754 (D.D.C. Nov. 14, 2006) (Collyer, J.), a case alleging a policy of strip searching all female pre-presentment arrestees but not males, *id.* at *4, the court denied dismissal of the plaintiffs' equal protection claims despite the qualified immunity defense asserted by the former U.S. Marshal, *id.* at *6.  The court explained:

> Although there are no D.C. Circuit opinions addressing the exact conduct alleged here, relevant Supreme Court authority provides sufficiently clear guidance to government officials regarding the proper scope of strip searches of arrestees such as the putative class members [female pre-presentment arrestees].  *See Bell v. Wolfish*, 441 U.S. 520, 558-60 (1979) (establishing a balancing test to determine whether a strip search is valid under the *Fourth Amendment*); *U.S. v. Virginia*, 518 U.S. 515, 531 (1996) (holding that governmental discrimination between males and females violates Equal Protection unless the government shows an "exceedingly persuasive justification" for the disparate treatment).  Based on these authorities, the Court finds that it would have been clear to any reasonable official in former Marshal Dillard's position that a blanket strip search policy under which all female– but not male– arrestees were strip searched, regardless of the offenses with which they were charged or any individualized suspicion that they were concealing contraband, was unconstitutional under the *Fourth* and *Fifth*[19] *Amendments*.

---

[18] To be clear, I am not relying on *Johnson* itself as persuasive authority because it is unpublished and in any event had not been handed down when the alleged violations at CBIC occurred; rather, I am adopting the rationale of the *Johnson* court, which relies on Supreme Court cases (*Bell* and *U.S. v. Virginia*) that were decided well before 2003.

[19] This case is analyzed under the Fifth Amendment because it alleges Equal Protection claims against the federal government rather than a state; however, this does not change the

*Id.* at *5-6 (parts of internal citations omitted; italics in original).  *See also Mary Beth G.*, 723

F.2d at 1274 (relying on Supreme Court law to hold that a gender-based strip search policy was

subject to scrutiny under the Equal Protection Clause).  Therefore, the right to be free from

gender-based strip searches was clearly established in 2003.[20]

With respect to the over detention claims, being detained for an unreasonable length of

time (more than 48 hours) without presentment is a clearly established violation of constitutional

rights.  *See McLaughlin*, 500 U.S. at 56-57.  *McLaughlin* further established that the 48 hour

threshold affects which party carries the burden, but does not automatically immunize pre-

presentment detentions lasting less than 48 hours.  *See id.*  Given that the facts of plaintiff Jones'

detention have not yet been established, it would be premature to grant defendants qualified

immunity because Jones could still "prove that his . . . probable cause determination was delayed

unreasonably."  *Id.* at 57.

The qualified immunity determination with respect to all strip search and over detention

claims (both the named plaintiffs' and Jones') thus will ultimately turn on the development of the

factual record.  In conclusion, there are no qualified immunity grounds that bar proceeding with

all claims against the Wardens at this time, although the issue may be raised again, if warranted,

on summary judgment.

*Claims Against Warden Franks in His Individual Capacity*

The Wardens point out, and the plaintiffs apparently concede, that there is no named

---

underlying principles.

[20] That the reported cases involve strip searches of females rather than males does not
affect the underlying Equal Protection analysis related to gender-based governmental action.

plaintiff who claims to have suffered a constitutional violation during Warden Franks' tenure. (Pls.' Opp'n State Defs.' Mot. Dismiss at 25-28.)   The defendants therefore ask that claims against Franks in his individual capacity be dismissed.   (State Defs.' Mot. Dismiss at 20.) Despite the likely truth of the plaintiffs' contention that they will find a named plaintiff as litigation proceeds, they cannot bring § 1983 claims for damages against Franks without identifying a plaintiff who states a cognizable claim against him.   All claims against Warden Franks in his individual capacity[21] will therefore be dismissed.[22]

*Plaintiffs' Standing to Obtain Injunctive and Declaratory Relief*

The Wardens argue that the plaintiffs do not have standing to sue them in their official capacities for prospective injunctive relief because the plaintiffs' assertion that they are "reasonably likely to be re-admitted' - i.e. arrested again - is insufficient.   (State Defs.' Mot. Dismiss at 3-6.)   To have standing to obtain equitable relief under § 1983, a plaintiff must make "a showing of irreparable injury, a requirement that cannot be met where there is no showing of any real or immediate threat that the plaintiff will be wronged again– a 'likelihood of substantial and immediate irreparable injury.'" *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983) (internal citations omitted).   The plaintiffs argue that named plaintiffs Saunders and Haig have standing because Saunders' history shows he is very likely to be re-arrested, and Haig has an outstanding bench warrant for his arrest.   (3d Am. Compl. ¶¶ 59, 69, 393.)   I will address the

---

[21] These are Counts 1 (suspicionless strip search), 2 (non-private strip search), 3 (equal protection strip search), and 11 (equal protection underwear strip search).   (Pls.' Opp'n State Defs.' Mot. Dismiss at 25.)

[22] Dismissal is without prejudice to any subsequent plaintiff's attempt to bring such a claim against Warden Franks in his individual capacity.

situations of Saunders and Haig separately.

Saunders has indeed been frequently admitted to CBIC, and common sense suggests that he is likely to be arrested and taken there again.  Courts generally are reluctant to find the requisite level of likelihood of future harm when standing is asserted based on repeat run-ins with the law or on being arrested again.  *See*, *e.g.*, *Honig v. Doe*, 484 U.S. 305, 320 (1988); *O'Shea v. Littleton*, 414 U.S. 488, 496-98 (1974); *Lyons*, 461 U.S. at 103; *Slade v. Hampton Roads Regional Jail*, 407 F.3d 243, 249 (4th Cir. 2005); *Lynch v. Leis*, 382 F.3d 642, 647-48 (6th Cir. 2004).  The existence of a class, however, could alter the analysis.  *See Slade*, 407 F.3d at 249 (distinguishing application of the "capable of repetition, yet evading review" doctrine in class actions and individual actions) (internal quotations omitted); *see also id.* at n.4 (noting possible exception to mootness principles "where the plaintiff introduces evidence that he has been detained 'on more than one occasion'") (citing *Demery v. Arpaio*, 378 F.3d 1020, 1027 (9th Cir. 2004) (creating such an exception)); *see also Lewis v. Tully*, 99 F.R.D. 632, 639, 644-45 (N.D. Ill. 1983) (explaining that "though the issues of 'mootness' and 'standing' . . . typically arise at different stages of a lawsuit, the essential inquiry is indistinguishable" and finding standing for injunctive relief for class of prisoners because "new persons with 'live' claims for injunctive relief . . . are constantly entering the category of those subject to defendants' alleged practice," irrespective of named plaintiff's ability to obtain standing for injunctive relief individually) (internal citations omitted).[23]   The issue of Saunders' standing is thus properly considered in the context of class certification, if such a motion is made, rather than at the

---

[23] Note that the Seventh Circuit apparently rejected this approach in *Robinson v. City of Chicago*, 868 F.2d 959, 967-68 (7th Cir. 1989), although it did not specifically overrule *Tully*.

present time.

Haig is in a different situation due to the outstanding bench warrant for his arrest for failing to appear at his court hearing for re-selling Orioles tickets.  (3d Am. Compl. ¶¶ 60, 69.) Haig currently resides in California (*id.* at cover page), where the Governor has a statutory duty "to have arrested and delivered up to the executive authority of any other State any person charged in that State with treason, felony, *or other crime*, who has fled from justice and is found in this State" (Cal. Penal Code § 1548.1 (2006)) (italics added).  Due to his failure to appear at his court hearing in Maryland and his current residence in California, Haig falls into the category of persons whose arrest and delivery to the state in which the crime was committed is legally mandated.  It could be argued that California law enforcement is unlikely to prioritize finding those charged with minor offenses in another state; however, this court must assume that a state's executive will follow the law rather than speculate about what priorities a governor will set for law enforcement.  Under California law, Haig's arrest and return to Maryland is required and may happen at any moment.  Therefore, Haig may be said to live in apprehension of a real and immediate threat of being returned to Maryland and re-admitted to CBIC.[24]  Once at CBIC, it is alleged that Haig, as a male arrestee, will be subject to a full strip search in a non-private situation pursuant to CBIC's policies.  Accepting the plaintiffs' allegations as true, as I must for the purposes of a 12(b)(6) motion, it follows that Haig faces a real and immediate threat of substantial and irreparable harm to his Fourth and Fourteenth Amendment rights.  This case is

---

[24] The plaintiffs do not mention which court issued the bench warrant; however, as Haig was arrested in Baltimore City, it would follow that it was a court of Baltimore City and that Haig would therefore be taken to CBIC, since that is where Baltimore City arrestees are taken. (3d Am. Compl. ¶¶ 69, 98, 106.)

thus distinguishable from *Lyons*, in which the plaintiff failed to establish a sufficient likelihood either of re-arrest or of being subject to the alleged unconstitutional behavior (choke hold) were he to be re-arrested.  *See Lyons*, 461 U.S. at 105-06 (explaining that plaintiff failed to allege "that he would have another encounter with the police . . . [and] to make the incredible assertion . . . that *all* police officers in Los Angeles *always* choke any citizen with whom they happen to have an encounter . . .") (italics in original).  Haig has sufficiently alleged both that he is substantially likely to have another experience at CBIC and that this will involve the alleged constitutional violations, therefore he has standing to sue for equitable relief on at least some of the plaintiffs' claims.[25]

As to Haig, because the likelihood of his future admission to CBIC is based on an outstanding warrant, he would not be subject to over detention under the plaintiffs' theories because those claims relate to people arrested without warrants who are over detained prior to presentment.  Furthermore, Haig has not alleged that he was subject to an underwear strip search

---

[25] The Wardens urge the court to apply the "fugitive disentitlement doctrine" and deny Haig standing.  (State Defs.' Reply Pls.' Opp'n Mot. Dismiss at 2-3.)  This discretionary, equitable measure reflects several policy considerations.  *See Jaffe v. Accredited Surety & Casualty Co.*, 294 F.3d 584, 595-96 (4th Cir. 2002).  "These include (1) a party's fugitive status can render a judgment 'impossible to enforce'; (2) the inequity of allowing a fugitive to 'call upon the resources of the Court for determination of his claims,' and (3) the need to 'discourage[] the felony of escape and encourage[] voluntary surrenders." *Id.* at 596 (internal citations omitted).  None of the underlying policies strongly points towards application of this doctrine here.  There would be no difficulty with enforcing a judgment; constitutional violations should be redressed whether perpetrated against fugitives or others; and while failure to show up for court and fleeing the state is criminal behavior, having standing to obtain injunctive relief for governmental actions connected to arrests, booking, and processing virtually necessitates having been arrested and being likely to be re-arrested, making fugitives likely, if not necessary, plaintiffs.  Thus the defendants' argument is essentially that Haig is not entitled to standing because he is a fugitive, which if accepted would mandate the application of this doctrine to all fugitives rather than maintaining its discretionary nature.

in the past, and the plaintiffs allege that the general CBIC policy is to subject males to a full strip search.  (3d Am. Compl. ¶ 154.)  While no named plaintiffs thus clearly have standing to bring suit for equitable relief with respect to the over detention or underwear strip search claims, I reserve for future consideration the possibility that if classes are certified in this case, there might be additional arguments, discussed above, for finding standing with respect to all claims.

**City Defendants' Motion to Dismiss for Failure to State a Claim**

The City defendants do not dispute that they are subject to suit under § 1983.  *See Monell v. Dept. Soc. Serv.*, 436 U.S. 658, 690 (1978); *Chin v. City of Baltimore*, 241 F. Supp. 2d 546, 548 (D. Md. 2003) (Blake, J.) (holding that the BPD may be sued under § 1983).  Rather, they claim that the plaintiffs seek to hold them responsible for circumstances they do not and cannot control– namely, the policies and practices at CBIC.  (Mem. Supp. City Defs.' Mot. Dismiss at 12.)  This interpretation of the plaintiffs' arguments, however, is inaccurate.  The plaintiffs do not seek to impose liability on the City defendants for CBIC's actions, but for the City and the BPD's *own* actions: taking arrestees to CBIC despite having knowledge of the allegedly unconstitutional strip searches and over detentions at CBIC.  The plaintiffs thus seek to bring claims against the City defendants under the theory of "entrustment liability", as discussed below.

*"Entrustment Liability"*

An "entrustment liability" approach has been neither adopted nor rejected in the Fourth Circuit.  It has been accepted in other circuits, although not always labeled as such.  *See Warren v. District of Columbia*, 353 F.3d 36, 39 (D.C. Cir. 2004) (holding that allegations that District had or should have had knowledge of alleged constitutional violations suffered while plaintiff

19

was incarcerated in a private prison operated pursuant to a contract with the District were

sufficient to state a claim); *Baker v. District of Columbia*, 326 F.3d 1302, 1306-07 (D.C. Cir.

2003) (holding that allegations of deliberate indifference on the part of the municipality which

was responsible for sentencing a prisoner toward known constitutional violations at another

state's facility which was detaining the prisoner were sufficient to survive 12(b)(6) motion);

*Young v. City of Little Rock*, 249 F.3d 730, 736 (8th Cir. 2001) ("Strip searching of prisoners is

routine procedure, and the jury could reasonably infer that the City knew that a person entering

the jail . . . would be strip searched . . . in these circumstances, it is far from unfair to attribute to

the City the policies routinely used by the County jail in the housing and processing of City

prisoners.").  While the formulations differ slightly, the underlying premise is that "a municipal

body that maintains a policy of entrusting its arrestees to a jail[26] with knowledge of the

unconstitutional treatment those persons will face upon their confinement there can be liable

under §1983."  *Powell v. Barrett*, 376 F. Supp. 2d 1340, 1355 (N.D. Ga. 2005).[27]  Liability thus

requires that the accused municipality have both a policy of entrustment and knowledge of

constitutional violations at the detaining entity.  *Id.* at 1355.

    Even assuming the theory of "entrustment liability" would be recognized in the Fourth

---

    [26] Although CBIC is not technically a jail, but a booking and processing site, this distinction does not undermine the theory.

    [27] Note that another case involving the "entrustment liability" theory, *Ford*, 154 F. Supp. 2d at 148-49, did not require knowledge on the part of the entrusting authority but rather placed on the city "an affirmative obligation . . . to ensure that the policy of the Jail officials did not lead to widespread violation of BPD [Boston Police Department] arrestees' constitutional rights."  As the plaintiffs here plead that the City defendants had actual knowledge, and the claim will be dismissed for other reasons, whether an "entrustment liability" theory may be pursued absent knowledge by the defendant(s) does not need to be addressed.

Circuit, however, the plaintiffs here are unable to state claims under it upon which relief could be granted.  Implicit in the policy component required to impose liability is that the entrusting entity has formulated the policy; that is, that it had a choice over whether to follow the challenged course of action.  *See Powell v. Barrett*, 2005 U.S. Dist. LEXIS 685, *37-38 (N.D. Ga. 2005) (explaining that the entrusting entity cannot be liable "for constitutional injuries suffered by a detainee unless it had the authority to choose whether to entrust such a person to the facility.") (unpublished) (internal citations omitted).  The City defendants persuasively argue that they have no choice because they are not legally permitted to maintain their own facility; therefore it would be unfair to hold them liable for using the facility they are required to use by state law.  (Mem. Supp. City Defs.' Mot. Dismiss at 9; City Defs.' Reply Mem. Supp. Mot. Dismiss at 4-5.)  *See also* Md. Code Ann., Corr. Servs. §§ 5-102, 201, 401, 404 (2006).  The steps which the plaintiffs contend the City defendants could have taken to prevent violations of arrestees' constitutional rights do not suggest the existence of choice sufficient to give rise to liability.  For instance, the plaintiffs argue that the City defendants could have filed a lawsuit against CBIC.  (Pls.' Opp'n Mot. Dismiss at 35.)  In fact, the City attempted to intervene as a plaintiff in the state court suit regarding over detentions, but was denied leave to do so.  (Mem. Supp. City Defs.' Mot. Dismiss at 12.)  This illustrates the flaw with the argument that the ability to file a lawsuit shows the existence of meaningful control: the court ultimately decides the outcome of the issues in a suit, thus filing a suit is, on some level, an admission that external help is needed to effectuate the desired results.

The plaintiffs also argue that there is a category of arrestees whose violations could have been processed with citations and thus, in arresting them, the City defendants essentially chose to

take them to CBIC.  (Pls.' Opp'n Mot. Dismiss at 42-43.)  The complaint, however, does not

identify such a group.  Instead it categorizes the plaintiffs based on the types of constitutional

violations they allegedly suffered (*e.g.*, equal protection strip search class), and would make the

City defendants liable for all persons in a given category of violations, even if the underlying

arrest was clearly justified.  (*See* City Defs.' Reply Mem. Supp. Mot. Dismiss at 6.)  There may

be a group for which citations could or should have been used; however, even if the plaintiffs

had pled this, there would be significant concerns for the court in attempting to define the

membership in this group, as doing so would likely necessitate more judicial assessment of

discretionary law enforcement priorities and procedures than would be warranted.  Therefore, the

potential existence of such a group fails to supply the element of choice necessary to give rise to

liability under the "entrustment liability" theory.

Because the court finds that the unique facts of this case render the "entrustment liability"

theory inapplicable, there is no need to consider arguments about its validity generally under

Fourth Circuit law.

A separate order follows.

   January 4, 2007                                            /s/                          
Date                                              Catherine C. Blake
                                                  United States District Judge