## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| ERIC JONES, et al. | : | |
| | : | |
| | : | |
| v. | : | Civil No. CCB-05-1287 |
| | : | |
| | : | |
| SUSAN MURPHY, et al. | : | |

## MEMORANDUM

Now pending in this long-running civil rights litigation are the motions for summary

judgment filed on behalf of Susan Murphy and William Jednorski, two former wardens of the

Central Booking and Intake Center ("CBIC") in Baltimore City.  The plaintiffs allege violations

of the Fourth Amendment because they were subjected to a blanket policy of "suspicionless"

strip searches before "presentment" to a judicial officer even though they had been arrested for

minor offenses not involving weapons or contraband and were not being admitted to general

population.  The defendant wardens deny the existence of a blanket policy, deny they are subject

to supervisory liability, and, at issue for purposes of this opinion, assert the defense of qualified

immunity.  For the reasons stated below, considering the unsettled state of the law following the

Supreme Court's decision in *Florence v. Board of Chosen Freeholders*, 132 S. Ct. 1510 (2012),

the motions for summary judgment will be granted.[1]

## BACKGROUND

Plaintiffs Dana West, Eric Jones, Gary Saunders, Anthony Haig, and Michael

Washington were each arrested and brought to the Baltimore Central Booking and Intake Center

("Central Booking" or "CBIC") on charges or in cases not involving weapons, drugs, or felony

---

[1] Presumably, this would require summary judgment in favor of Warden Mitchell Franks as well, although he has
not filed a motion for summary judgment while his motion to shorten the class period has been pending.

violence at least one time between August 2002 and April 2005. Central Booking is an agency of

the Division of Pretrial Detention and Services, which is a division of the Maryland Department

of Public Safety and Correctional Services. It opened in 1995 and is the centralized location for

booking and processing all arrestees in Baltimore City. (*See* ECF No. 378, Ex. 9.) Between 2002

and 2008, Central Booking processed an average of approximately 83,372 arrestees per year, or

228 per day. (*See* Nichols Decl., ECF No. 400-58, Ex. 251, ¶ 4.)

Central Booking is divided into two sections, the booking area and the housing area.  The

booking area is located on the second floor and consists of a central booking unit, a medical unit,

a classification unit, a records unit, court commissioners' offices, video bail facilities, and a

computerized Arrest Booking System.  (*See* Murphy Dep., ECF No. 378, Ex. 12, at 28-29; ECF

No. 378, Ex. 9.) It is separate from the housing area, a "maximum security facility" which makes

up the third, fourth, and fifth floors and houses male pretrial detainees who have been committed

by a court commissioner.[2] (Murphy Dep., ECF No. 378, Ex. 12, at 28-29; Smith Dep., ECF No.

400-36, Ex. 205, at 18-19.)

After passing through a metal detector and pat search at the facility's entrance, every

arrestee brought to the booking area goes through a process that includes a brief medical exam, a

more thorough search, intake at the booking window, and a fingerprint and photo identification.

(*See* ECF No. 378, Ex. 9, at 16; Wilson Decl., ECF No. 439-1, Ex. 111, ¶ 2.) Arrestees do not

enter a "general population" after the initial search during the booking process. (Murphy Dep.,

ECF No. 400-34, Ex. 202, at 58-59.) Rather, they are held on the booking floor in group holding

cells containing up to 20-25 arrestees. (ECF No. 439-1, Ex. 111, ¶ 8.) Arrestees are not

segregated within the group holding cells based on charge or criminal history (*Id.* at ¶ 10.) They

are placed in these holding cells at any time after being searched in the search room, including

---

[2] The housing area is not at issue in this case.

before going to the booking window, between the booking window and identification, and before or after medical evaluations. (*Id.* at ¶ 8.) Arrestees remain in group holding cells until presentment before a court commissioner, generally within 24 hours of their arrival at Central Booking. (Murphy Dep., ECF No. 400-34, Ex. 202, at 52.) Once an arrestee has appeared before a commissioner, he is either released or committed to the housing area on floors three, four, and five of Central Booking, i.e. general population. (*See id.* at 59; Smith Dep., ECF No. 400-36, Ex. 205, at 18.)

Despite the security procedures in place on the booking floor, contraband use and exchange among arrestees is a significant problem.  Staff at Central Booking have observed arrestees attempting to bring a variety of contraband into the facility, including guns, knives, razors, drugs, cigarettes, money, and cell phones. (*See, e.g.*, Diggs Dep., ECF No. 378, Ex. 32, at 22, 88-89; V. Irvine Dep., ECF No. 378, Ex. 38, at 60, 79, 84-87; L. Jones Dep., ECF No. 378, Ex. 60, at 24. ) Staff who had conducted naked strip searches identified numerous items they discovered through such searches. For example, one employee found a knife, on one occasion, and drugs, on another, in the rectum of an offender. (V. Irvine Dep., ECF No. 378, Ex. 38, at 80-82.) Another employee found drugs on many occasions as well as lighters, money, cigarettes, and razor blades, in the vaginal area of women she searched. (B. Martin Dep., ECF No. 378, Ex. 61, at 28-29, 52, 61.) A third Central Booking staff member reported finding contraband – mostly drugs – on approximately half of the people he searched, including "in their buttocks, [and] under their testicles." (Reaves Dep., ECF No. 378, Ex. 34, at 19.)

At times, arrestees have been successful at smuggling contraband into Central Booking's group holding cells. One Central Booking employee reports confiscating cell phones from arrestees in the cells "numerous times." (Diggs Dep., ECF No. 378, Ex. 32, at 106.) Staff also

describe smelling marijuana coming from group holding cells on several occasions. (*Id.* at 108;

V. Irvine Dep., ECF No. 378, Ex. 38, at 82).  In one incident, an arrestee was injured by box

cutters she had carried into the holding cell. (Stevenson Dep., ECF No. 378, Ex. 58, at 43.)

Indeed, the plaintiffs themselves observed contraband use and exchange in the holding cells they

shared with other arrestees. Plaintiff Aaron Ross testified that an arrestee in the group cell in

which he was held pulled out a marijuana joint and matches and passed the joint around to others

in the cell. (Ross Dep., ECF No. 378, Ex. 67, at 116.) Plaintiff Tonia Bowie stated that an

arrestee in her holding cell shared drugs hidden in her bra with others in the cell. (Bowie Dep.,

ECF No. 378, Ex. 65, at 37-39.)[3]

The presence of drugs and other contraband at an intake facility like Central Booking

creates substantial security concerns. Arrestees who use drugs could become so intoxicated that

they might be difficult for staff to handle. (Cook Dep., ECF No. 439-4, Ex. 114, at 82.) Arrestees

could overdose on drugs or give or sell them to others who might overdose. (*Id.* at 81.) In

addition, arrestees who successfully sneak weapons into the facility could use them to harm other

inmates or corrections officers. (*Id.* at 84.) The defendants have acknowledged, however, that

security is less of a concern on the booking floor as compared to the housing area, and that strip

searching was not really necessary to preserve security on the booking floor. (*See* Murphy Dep.,

ECF No. 400-34, Ex. 202, at 59-60; Jednorski Dep., ECF No. 400-33, Ex. 201, at 77.)

The representative plaintiffs in this case were arrested in Baltimore City without warrants

on charges not involving drugs, weapons, or felony violence between August 2002 and April

2005.  Each was brought to the CBIC booking floor, where he was forced to either strip naked or

drop his underwear, squat, and cough as part of a search before being taken to a group holding

---

[3] Neither Ross nor Bowie represents the "suspicionless strip search" class, as neither alleges being strip searched without reasonable suspicion pursuant to his/her booking at CBIC.

cell. (West Dep., ECF No. 378, Ex. 64, at 45; Haig Dep., ECF No. 378, Ex. 66, at 17-18; Saunders Dep., ECF No. 378, Ex. 68, at 24; Washington Dep., ECF No. 378, Ex. 69, at 57-60.) Plaintiff Anthony Haig describes also having to lift his genitalia and spread the cheeks of his buttocks before squatting in the presence of an officer and one other arrestee. (ECF No. 378, Ex. 66, at 17-18.)[4] No contraband was found on any of the plaintiffs, nor did the defendants indicate any reason to believe the plaintiffs carried contraband into their holding cells.

According to data from Central Booking's Automated Booking System (ABS), the representative plaintiffs shared cells with numerous different arrestees while they were held at Central Booking. Dana West shared a group holding cell with at least 55 distinct arrestees upon being booked at CBIC in January 2005. Gary Saunders shared a group holding cell with 20 distinct arrestees in February 2005. Anthony Haig, Michael Washington, and Kevin Adams each shared a cell with 35, 36, and 36 distinct arrestees, respectively, in April 2005. Though the representative plaintiffs (and, by definition, the class) were arrested on minor charges, some of their cellmates had been charged with major offenses ranging from armed robbery to first-degree assault to distribution of cocaine and heroin.[5] (*See* Felder Decl., ECF No. 439, Ex. 116.) All of the plaintiffs were released directly from the booking floor upon presentment before a court commissioner. None was admitted to general population on the upper floors of CBIC.[6]

The plaintiffs in this case allege that, pursuant to booking at CBIC, each was strip searched without any individualized finding of reasonable suspicion by CBIC employees that he was concealing drugs, weapons, or other contraband. (ECF No. 146, ¶¶ 9, 25-78.) The plaintiffs

---

[4] None of the plaintiffs reported being touched by officers as part of the search.

[5] The defendants used information contained in Central Booking's Automated Booking System to identify other detainees with whom each representative plaintiff shared a group holding cell at Central Booking. (*See* Felder Decl., ECF No. 439, Ex. 116.)

[6] Indeed, approximately seventy-five percent of individuals arrested without a warrant on charges not involving drugs, weapons, or felony violence between 2002 and 2008 were released directly from the booking floor and never entered the general population. (*See* Nichols Decl., ECF No. 400-58, Ex. 251, ¶ 6.)

seek to challenge this alleged practice via a class action lawsuit on behalf of themselves and all

other persons similarly situated. (*Id.* at ¶¶ 1, 9.) On March 19, 2009, prior to *Florence*, the court

certified the following class:

> Each person who, during any time from May 12, 2002 until April 30, 2008, was taken to Baltimore Central Booking and Intake Center (a) on charges [or in cases] not involving weapons, drugs, or felony violence, and (b) strip searched (c) prior to or without presentment before a court commissioner or other judicial officer.

(ECF No. 271.)  The court defined "strip search" for the purpose of class certification as "the

removal, pulling down, or rearrangement of clothing for the visual inspection of a person's

genital and/or anal areas, which may also include requiring the person to squat and cough, in the

presence of one or more guards." (*Id.*)

## ANALYSIS

Government actors are entitled to qualified immunity from liability for civil damages

"insofar as their conduct does not violate clearly established statutory or constitutional rights of

which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)

(quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)) (internal quotation marks omitted).

In determining whether qualified immunity applies, courts typically undergo a two-step analysis,

assessing: (1) "whether the facts that a plaintiff has alleged . . . make out a violation of a

constitutional right," and (2) "whether the right at issue was 'clearly established' at the time of a

defendant's alleged misconduct." *Pearson*, 555 U.S. at 232 (internal citation omitted).  Courts

have discretion, however, to decide which of the two prongs should be addressed first.  *Id.* at

236.

"To be clearly established, a right must be sufficiently clear that every reasonable official

would [have understood] that what he is doing violates that right," and "existing precedent must

have placed the statutory or constitutional question beyond debate."  *Reichle v. Howards*, 132 S.

Ct. 2088, 2093 (2012) (internal quotation marks and citations omitted). Courts should "define

the right in light of the specific context of the case, not as a broad general proposition . . . that is,

[whether it was] clear to a reasonable officer that the conduct in which he allegedly engaged was

unlawful in the situation he confronted." *McKinney v. Richland Cnty. Sheriff's Dep't*, 431 F.3d

415, 417 (4th Cir. 2005). The determination of whether a right was clearly established is

"essentially [a] legal question," to be made by the court. *Mitchell v. Forsyth*, 472 U.S. 511, 526

(1985). This court should look to case law from the Supreme Court and the Fourth Circuit in

assessing whether a right is clearly established. *Edwards v. City of Goldsboro*, 178 F.3d 231, 251

(4th Cir. 1999).

At the time of the court's ruling on the defendants' motion to dismiss in 2007, and later

when the class was certified in 2009, the wardens did not appear entitled to rely on qualified

immunity. Under Fourth Circuit law, "the right of those arrested for offenses not likely to

involve weapons or contraband to be free from strip searches without any individualized finding

of reasonable suspicion appears to be clearly established." *Jones v. Murphy*, 470 F. Supp. 2d

537, 547 (D. Md. 2007) (citing *Logan v. Shealy*, 660 F.2d 1007, 1013 (4th Cir. 1981); *Amaechi

v. West*, 237 F.3d 356, 365 (4th Cir. 2001); *Abshire v. Walls*, 830 F.2d 1277, 1279-80 (4th Cir.

1987)). The recent decision by the Supreme Court in *Florence*, however, established that it does

not violate the Fourth Amendment to require a strip search of every arrestee who will be

admitted to the general population of a jail regardless of the offense for which he is arrested and

without the need for individualized suspicion that the arrestee may have contraband or weapons.

132 S. Ct. at 1513-14, 1522.[7] In so ruling, the Court relied on its analysis in *Bell v. Wolfish*, 441

U.S. 520 (1979), and the need for correctional officials managing a detention center or jail to

---

[7] The Court noted the imprecision of the term "strip search" and generally described it as a "close visual inspection while undressed." 132 S. Ct. at 1513. It may involve exposure of breasts, buttocks, and genital areas but does not, within the scope of *Florence*, include touching of unclothed areas by the inspecting officer. *Id.* at 1515.

have "substantial discretion to devise reasonable solutions to the problems they face."  132 S. Ct.

at 1515.  The Court also explained that "deterring the possession of contraband depends in part

on the ability to conduct searches without predictable exceptions," *id.* at 1516, and that

"deference must be given to the officials in charge of the jail unless there is 'substantial

evidence' demonstrating their response to the situation is exaggerated."  *Id.* at 1518.

The plaintiffs in this case point out that, under the class definition, although they had

been admitted to CBIC, they had not yet been presented to a judicial officer for a determination

of whether they would be admitted to the general jail population, or instead released, possibly

even without presentment.  Thus, they argue that the Fourth Circuit's prior case law still applies

to their circumstances, or that they fit within the possible "exceptions" acknowledged by Justices

Kennedy, Roberts, and Alito.  Regarding these "exceptions," Justice Kennedy noted that the

Court was not required "to rule on the types of searches that would be reasonable in instances

where, for example, a detainee will be held without assignment to the general jail population and

without substantial contact with other detainees."  *Id.* at 1522.  Justice Alito stated "the Court

does not hold that it is *always* reasonable to conduct a full strip search of an arrestee whose

detention has not been reviewed by a judicial officer and who could be held in available facilities

apart from the general population."  *Id.* at 1524.  And Chief Justice Roberts added "the Court

does not foreclose the possibility of an exception to the rule it announces."  *Id.* at 1523.

Not surprisingly, the arguments by counsel in this case, and the analysis stated in the now

numerous opinions which have been issued since *Florence*, focus on the possible contours of an

exception to the rule announced by the Court.  The plaintiffs here by definition have not been

presented to a judicial officer, and were at some point released from CBIC rather than being

admitted to the general jail population, thus satisfying certain aspects of a possible exception.

On the other hand, they were held in physical facilities that put them in substantial contact with other detainees, including some who were later admitted to general population, and under circumstances where contraband was apparently available at least on some occasions.  Analyzing similar circumstances, a district court in Iowa recently reversed its prior grant of summary judgment in favor of the plaintiffs and entered summary judgment in favor of the defendants as to the suspicionless strip search of detainees who were never admitted to general population but nonetheless on occasion were housed in cells with other detainees or handcuffed together for transportation to court.  *Rattray v. Woodbury Co.*, -- F. Supp. 2d --, 2012 WL 6114994, at **16, 21 (N.D. Iowa Dec. 10, 2012).

The question before this court is not whether the plaintiffs' Fourth Amendment rights were in fact violated but whether, even assuming they fall under an exception to the rule announced in *Florence*, the right was 'clearly established" such that "a reasonable person in the official's position would have known that his conduct would violate that right." *Edwards*, 178 F.3d at 251. The court must look to case law from the Supreme Court and Fourth Circuit to make this determination.  *Id.*

It does not appear that the Fourth Circuit has addressed *Florence* except to note, in an unrelated case, the Court's holding "that strip searches of any and all arrestees housed in general population of local detention centers and jails are constitutionally permissible." *Bennett v. R&L Carriers*, 2012 WL 2354633, at *21 (4th Cir. June 21, 2012).  Plaintiffs' counsel therefore argue that the holding in *Logan v. Shealy* is still controlling.  The difficulty is that the Supreme Court's opinion in *Florence* not only overruled some aspects of Fourth Circuit law (on which this court previously relied in denying the motion to dismiss) but in doing so left the contours of any "exception" that would apply to the plaintiffs in this case unclear and open to debate.  Simply

9

put, "*Florence* erased any bright lines that previously existed in this area of Fourth Amendment law regarding searches in a detention facility."  *Wamble v. County of Jones*, 2012 WL 2088820, at *15 (S.D. Miss. June 8, 2012).  Indeed, the divergence of opinions in the recent cases from other districts and circuits cited by both sides in their supplemental memoranda and letters underscores the present lack of a clear test applicable to the specific circumstances of detention practices at CBIC during the years at issue in this litigation.[8]

Accordingly, without addressing either the wisdom or the constitutionality of a blanket strip search policy at CBIC (if such policy was in place), the court is constrained to grant the individual defendant wardens' motions for summary judgment on the grounds of qualified immunity.

A separate Order follows.

March 5, 2013                                                          /s/
Date                                                     Catherine C. Blake
                                                         United States District Judge

---

[8]  It is important to note this case does not involve a strip search at a station house or some other facility where substantial contact with other detainees can be avoided, nor does it involve touching of unclothed areas of the body by correctional officers.