## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

DANA T. WEST, et al.[1]                    :
                                           :
                                           :
        v.                                 :        Civil No. CCB-05-1287
                                           :
                                           :
SUSAN MURPHY, et al.                       :
                                           :

## MEMORANDUM

In 2005, the plaintiffs in this case filed suit asserting constitutional challenges to strip-

search policies at the Baltimore Central Booking and Intake Facility ("Central Booking"), and to

the alleged practice there of detaining individuals arrested without a warrant for more than 48

hours without presenting them to a judicial officer (a practice they call "overdetention").  The

court certified a class of overdetained plaintiffs, and the defendants later moved to alter the class

period so it corresponds only to the defendant Susan Murphy's tenure as Central Booking's

warden from March 9, 2004, through June 22, 2005.  The plaintiffs did not oppose that portion of

the defendants' motion, and that portion of the motion will be granted.

Though several other motions are also before the court, the primary issue presented for

resolution is Ms. Murphy's motion for summary judgment on the plaintiffs' overdetention claim.

Among other things, Ms. Murphy argues that a reasonable jury could not find that she was

deliberately indifferent to delays in detainees' presentment or release.  The plaintiffs opposed the

motion, and a motions hearing was held on July 27, 2012.  For the reasons that follow, Ms.

Murphy's motion for summary judgment will be granted.  The remaining pending motions will

---

[1] On May 23, 2013, Eric Jones's claims were dismissed for his failure to participate in discovery or otherwise pursue those claims.

be denied as moot.

## BACKGROUND

Maryland's Department of Public Safety and Correctional Services ("DPSCS"), one of the "principal departments of the Executive Branch of the State government," Md. Code, State Gov't § 8-201, "is charged with overseeing the Maryland correctional system," *Glover v. State*, 794 A.2d 735, 740 (Md. Ct. Spec. App. 2002). One of the units within DPSCS is the Division of Pretrial Detention and Services ("DPDS"). Md. Code, Corr. Servs. § 2-201(3). The State of Maryland created DPDS because, among other things, "[t]here [was] an important public need to centralize and coordinate the provision of services to individuals on a pretrial status in Baltimore City," and the city "d[id] not have the financial resources to fund a local correctional facility at a level sufficient to meet the needs of those incarcerated." *Id.* § 5-102(c)-(d). Consistent with the reasons for its founding, DPDS is required by statute to operate a "centralized booking facility" containing "pretrial release services," "District Court Commissioners," an "Office of the State's Attorney for Baltimore City," and "Baltimore City Police Services." *Id.* § 5-404(b)(1)-(4). That facility is Central Booking.[2]

Before Central Booking opened in 1995, Baltimore Police Department ("BPD") "officers took arrestees directly to their districts for booking and processing." (DPDS Plan for Efficient and Timely Processing on the Booking Floor ("2005 DPDS Plan"), August 2005, Mot. Partial Summ. J. by William Jednorski Ex. 9, ECF No. 378-9, at 1.) Presentment of arrestees to court commissioners who "reviewed charges and determined bail or released the arrestee on personal

---

[2] To clarify, Central Booking "is run by the State, while the City controls the day-to-day management of the police. . . . Thus, the City Police deliver the accused to a state run facility." (Baltimore City Circuit Court Op. on Mot. Intervene, *Rodney v. Murphy*, Case No. 24-C-05-004405, Sept. 29, 2005, Mot. Summ. J. Ex. 87, ECF No. 392-19, at 4.)

recognizance" also occurred in the BPD's district offices.  (*Id.*)  Once Central Booking opened, however, it provided the location for "booking and processing all arrestees in Baltimore City." (Baltimore City Criminal Justice Coordinating Council, Booking Process Presentation ("Booking Process Presentation"),[3] Mot. Summ. J. Ex. 71, ECF No. 392-3, at 2.)  One reason for locating Central Booking's various services in one place was to help ensure that, in accordance with state law, individuals arrested in Baltimore without a warrant "be taken before a judicial officer . . . without unnecessary delay and in no event later than 24 hours after arrest."  Md. Rule 4-212(f)(1).  (*See also* Dep. of Lamont Flanagan, Mot. Summ. J. Ex. 70, ECF No. 392-2, at 46 (describing the reasons for Central Booking's establishment); Dep. of Susan Murphy, Mot. Partial Summ. J. by William Jednorski Ex. 12, ECF No. 378-12, at 47 (stating that court commissioners were placed at Central Booking "to expedite the already-overwrought criminal justice system in Baltimore City").)

Central Booking is comprised of six floors, (Dep. of Mitchell Franks, Mot. Summ. J. Ex. 72, ECF No. 392-4, at 85), extends for two city blocks, (Murphy Dep. at 36), and was designed to house between 800 and 900 detainees, (David M. Parrish, Analysis of Baltimore Central Booking and Intake Center ("Parrish Analysis"), October 21, 2005, Mot. Summ. J. Ex. 73, ECF No. 392-5, at 3; Booking Process Presentation at 3).[4]  It is divided into two sections: the booking area and the housing area.  (Franks Dep. at 85.)  The booking area is located on the second floor. (Murphy Dep. at 29.)  It consists of a booking unit, a medical unit, a classification unit, a records unit, court commissioners' offices, and video bail facilities.  (Booking Process Presentation at 3,

---

[3] Ms. Murphy represents, and the plaintiffs do not dispute, that the Booking Process Presentation was prepared in June 2005.  (Mot. Summ. J. at 7.)
[4] The number of detainees at Central Booking regularly exceeded its capacity during Ms. Murphy's tenure as warden.  (*See* Booking Process Presentation at 3 ("From June 2004 – May 2005 the average end of the month population was 1,183 (32% over capacity)").)

9; Franks Dep. at 99-102; Murphy Dep. at 48-50.)  Booking processes are linked through the computerized Arrest Booking System ("ABS").  (*See, e.g.*, Franks Dep. at 101-02.)  The housing area makes up the third, fourth, and fifth floors and houses male pretrial detainees who have been committed by a court commissioner.  (Murphy Dep. at 29.)  Only the booking area is at issue here.

During the relevant time period,[5] processing of each warrantless arrestee[6] at Central Booking involved both (1) processing of paperwork concerning the arrestee, and (2) the physical movement of the arrestee through different locations within Central Booking.  (Franks Dep. at 103.)  Processing of paperwork proceeded as follows.  Following a warrantless arrest, the arresting officer drafted a statement of probable cause.  (Booking Process Presentation at 7.) This could be done either remotely (through computers in the officer's district office) or at Central Booking.  (*Id.*)  If done remotely, the officer would complete the statement, sign a "signature pad," "lock[ ] the statement," and "hit[ ] the send button."  (*Id.*)  This made the statement available to a police liaison at Central Booking.  (*Id.*)  The police liaisons, themselves BPD officers, then printed the statement and gave it to a state's attorney.  (Murphy Dep. at 288.) Police liaisons were also responsible for "contacting the arresting officers if . . . any required documents [were] missing . . . ."  (2005 DPDS Plan at 3-4.)  If the arresting officer drafted the probable cause statement at Central Booking, the officer printed and handed it to a state's attorney, who reviewed it while the officer was present.  (Booking Process Presentation at 7.)

If the state's attorney decided not to charge the arrestee, that arrestee would be released

---

[5] Ms. Murphy was Central Booking's warden from March 9, 2004, until June 22, 2005.  Because practices there may have changed over the last ten years, the court will use the past tense when referring to them.
[6] Warrantless arrests are also referred to as "on-view arrests" at various places throughout the record.  (*See, e.g.*, Murphy Dep. at 53.)

without charge, a result referred to throughout the record by its acronym, "RWOC." (*See, e.g.*, Booking Process Presentation at 6.) If the state's attorney did decide to charge the arrestee, the charges were entered into the ABS. (*Id.*) The paperwork indicating the charge then made its way to a police liaison, who acknowledged receipt of the paperwork through the ABS. (*Id.* at 12.) A police liaison then delivered that paperwork to a "public safety officer," who entered into the ABS that the paperwork was received and delivered it to Pretrial Services. (*Id.*) Pretrial Services conducted a check of the arrestee's criminal record, and entered into the ABS that the check was completed. (*Id.*)

If Pretrial Services identified the arrestee as a "war room offender," i.e., a violent, repeat offender, the paperwork was sent to the "war room." (*Id.*; 2005 DPDS Plan at ii.) The war room, created in 2003, was a location at Central Booking staffed by the State's Attorney's office, the State Division of Parole and Probation, DPDS, and the BPD. (2005 DPDS Plan at ii.) Representatives of these agencies collaborated to identify individuals they deemed particularly dangerous, and subject them to "a more rigorous evaluation of court and supervision records" before clearing the arrestee to see a court commissioner. (*Id.*) If the arrestee was not identified as a war room offender, the paperwork returned to a public safety officer and then went to a court commissioner. (Booking Process Presentation at 12.)

The physical processing of warrantless arrestees at Central Booking proceeded as follows. The arresting officer affixed an identification wristband, which contained a barcode, onto the arrestee. (Dep. of William Smith, Mot. Summ. J. Ex. 76, ECF No. 392-8, at 145; Murphy Dep. at 269.) The officer put certain information into the barcode, including the time of arrest. (Smith Dep. at 145-47; Murphy Dep. at 269-272.) Officers then took the arrestee to

Central Booking.  Booking officers took the arrestee into the facility through its sally port.[7] (Franks Dep. at 97).  Public safety officers took the arrestee to a search room where they searched the arrestee.  (Booking Process Presentation at 9.)  After the search, public safety officers took the arrestee to the booking window, (*id.*), where the arrestee provided identifying personal information (name, address, etc.), and the wristband was scanned for information concerning the arrest, including the time it occurred, (Franks Dep. at 105-07).[8]  The arrestee was assigned "a unique identifying number" that was logged into the ABS to track the arrestee within Central Booking.  (Murphy Dep. at 269.)  The arrestee was then taken to the "identification room," where the arrestee's photographs and fingerprints were taken.  (Franks Dep. at 105.)  The arrestee was then given an opportunity for one free phone call.  (*Id.*)  After a medical screening, the arrestee was placed in a cell to await presentment before a court commissioner.  (*Id.*)  To facilitate the tracking of arrestees, the arrestee's wristband was scanned at each location throughout the process, and the location information was entered into the ABS.  (Smith Dep. at 145-47; Murphy Dep. at 276.)

Ms. Murphy began working at Central Booking as an assistant warden for security in 2001.  (Murphy Dep. at 28.)  At some point she transitioned into an assistant warden for booking, a position in which she served until she became acting warden on March 9, 2004.  (*Id.* at 64; Decl. of Susan Murphy ¶ 1, Mot. Partial Summ. J. by William Jednorski Ex. 3, ECF No. 378-3.)  She transitioned from acting warden to warden on June 23, 2004, and served in that

---

[7] In this context, a sally port is "a secure entryway (as at a prison) that consists of a series of doors or gates."  Sally port Definition, Merriam-Webster.com, http://www.merriam-webster.com/dictionary/sally%20port (last visited Feb. 23, 2015).

[8] There is also evidence in the record concerning "toe tags."  (*See, e.g.*, Booking Process Presentation at 5.) "A toe tag is a piece of paper that the arrestees would bring with them to Central Booking that had been filled out by the arresting police officer."  (Murphy Dep. at 220.)  It is unclear if toe tags and identification wristbands were both used, toe tags were used when wristbands were unavailable, or both performed the same function.

capacity until June 22, 2005.  (*Id.*; Mot. Summ. J. at 1.)  From March 9, 2004, to June 22, 2005,

111,749 individuals were booked at Central Booking, an average of 238 per day.  (Decl. of

Kevin Nichols, Pls.' Resp. Mot. Summ. J. Ex. 252, at 2.)

   Timely presentment of warrantless arrestees became an issue during Ms. Murphy's tenure

as warden.  Though officials were primarily concerned with Maryland's 24-hour limit, between

one and two percent of individuals booked at Central Booking during that time were warrantless

arrestees detained beyond the constitutional limit of 48 hours without presentment.[9]  The sources

of delays included: (1) the time it took for BDP officers to bring arrestees to Central Booking

following their arrest, (Murphy Dep. at 273; Franks Dep. at 238; Smith Dep. at 150-51); (2) the

failure of BPD officers to timely and properly complete the statements of probable cause to make

them accessible at Central Booking, (Murphy Dep. at 286-87; Dep. of Corey Moss, Mot. Summ.

J. Ex. 77, ECF No. 392-9, at 29; Smith Dep. at 150-51; Booking Process Presentation at 15); (3)

the failure of police liaisons to print the statements and/or give them to state's attorneys, (Franks

Dep. at 239; Murphy Dep. at 290, 305; Moss Dep. at 30-31); (4) delayed action by state's

attorneys once they received the statements, (Franks Dep. at 238-39; Flanagan Dep. at 52; Dep.

of David Becketts, Mot. Summ. J. Ex. 75, ECF No. 392-8, at 96-97); (5) war room delays,

(Becketts Dep. at 85; Murphy Dep. at 308-09); and (6) understaffing of court commissioners,

(Franks Dep. at 88-89, 238; Smith Dep. at 153; Booking Process Presentation at 19).

   In light of these delays, Maryland's Office of the Public Defender ("OPD") began filing

petitions for habeas corpus on behalf of individuals detained at Central Booking who were not

presented to a court commissioner within 24 hours of their warrantless arrest, as required by

Maryland law.  (*See* Baltimore City Circuit Court Op. on Mot. Intervene, *Rodney v. Murphy*,

---

[9] The plaintiffs say 2,212 such overdetentions occurred, while Ms. Murphy says 1,014 (and perhaps fewer) occurred.  The court need not, and does not, resolve that dispute here.

Case No. 24-C-05-004405, Sept. 29, 2005, Mot. Summ. J. Ex. 87, ECF No. 392-19, at 1

(recounting case history).)  That led to the filing of a class action suit against Ms. Murphy in the

Circuit Court for Baltimore City.[10]  (*Id.*)  On April 25, 2005, that court issued a temporary

restraining order ("TRO") ordering that "any individual held longer than 24 hours without being

taken before a judicial officer of the District Court as required by Rule 4-212 shall be

immediately released from [Central Booking] on any charges for which the individual was

denied prompt presentment, unless [Ms. Murphy] files a motion demonstrating good cause for

noncompliance . . . ."  (TRO, *Rodney v. Murphy*, April. 25, 2005, Mot. Summ. J. Ex. 86, ECF

No. 392-18.)  On May 9, 2005, the court extended the TRO until November 9, 2005.  (*See*

Second Am. Compl. ¶ 4, *Rodney v. Murphy*, Mot. Summ. J. Ex. 93, ECF No. 392-25.)

According to a news report, by May 10, 2005, the TRO had led to the release of 27 arrestees.

(Ryan Davis, "Deal extends city jail order," *Baltimore Sun*, May 10, 2005, Mot. Summ. J. Ex.

88, ECF No. 392-20.)  The City of Baltimore then moved to intervene, citing "the urgent health

and safety risks posed by the release of dangerous individuals into the community . . . ."  (*See*

Mot. Shorten Time for Response in Mot. Intervene, *Rodney v. Murphy*, June 29, 2005, Mot.

Summ. J. Ex. 89, ECF No. 392-21.)  The court denied the City's motion on September 29, 2005,

but allowed the City to participate as an amicus.  (Mot. Summ. J. Ex. 87.)  At the court's

direction, DPDS produced and submitted the 2005 DPDS Plan, which called for a number of

systemic changes.  (*Id.* at 4; 2005 DPDS Plan.)  The court dissolved the injunction and dismissed

the case on September 15, 2006.  (Mot. Summ. J. at 23; Pls.' Proposed Class Definitions, ECF

No. 268, at 1 n.1).  The *Rodney* court's involvement spurred the affected agencies to display an

"unprecedented" level of cooperation and work together to solve the problems delaying

---

[10] The exact date the suit was filed is unclear from the record.

presentment.  (Parrish Analysis at 4.)

Meanwhile, on May 12, 2005, former detainees at Central Booking filed a complaint in this court asserting claims of overdetention and unconstitutional strip searches.  Count Four of the Fourth Amended Complaint asserts a claim of supervisory liability against Ms. Murphy in her individual capacity for overdetentions at Central Booking during her time as warden.[11] (Fourth Am. Compl. ¶ 294, ECF No. 146.)  Years of litigation followed.  On March 19, 2009, the court certified a class of overdetained individuals.  On January 31, 2011, Ms. Murphy moved for summary judgment as to the overdetention claim against her.  The plaintiffs responded.  A motions hearing was held on July 27, 2012.[12]

## ANALYSIS

**Summary Judgment Standard**

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no *genuine* dispute as to any *material* fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a) (emphasis added).  Whether a fact is material depends upon the substantive law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Accordingly, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment."  *Id.* at 247-48.  "A party opposing a properly supported motion for summary judgment 'may not rest

---

[11] The count also asserts a claim against William Jednorski in his individual capacity, and Mitchell Franks in his official capacity.  Mr. Jednorski preceded Ms. Murphy as warden at Central Booking, and Mr. Franks succeeded her.  On December 6, 2010, the three defendant wardens moved to alter the class periods, including by limiting the overdetention class period to Ms. Murphy's tenure as warden.  The plaintiffs did not oppose the motion to the extent it sought to limit the overdetention class period.  Accordingly, the court will grant that motion to the extent it seeks to limit the overdetention class period, and will deny it as moot to the extent it seeks to limit the strip search class period.

[12] On March 5, 2013, the court granted summary judgment to Ms. Murphy and Mr. Jednorski on the plaintiffs' strip search claims, on the grounds of qualified immunity.  The remainder of the case was stayed pending the Fourth Circuit's review of that decision.  The Fourth Circuit affirmed on November 14, 2014.  *West v. Murphy*, 771 F.3d 209 (4th Cir. 2014).

upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). The court must view the evidence in the light most favorable to the nonmovant and draw all justifiable inferences in his favor. *Greater Baltimore Ctr. for Pregnancy Concerns, Inc. v. Mayor and City Council of Baltimore*, 721 F.3d 264, 283 (4th Cir. 2013) (en banc). At the same time, the court must not yield its obligation "to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (citation and internal quotation marks omitted).

**Supervisory Liability**

The plaintiffs raise a constitutional claim against Ms. Murphy, and seek to hold her liable for their overdetentions under a theory of supervisory liability. Supervisory liability under 42 U.S.C. § 1983 "is not premised upon *respondeat superior* . . . ." *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994). Rather, to succeed on a § 1983 claim based on supervisory liability, a plaintiff must show:

> (1) that the supervisor had actual or constructive knowledge that h[er] subordinate was engaged in conduct that posed "a pervasive and unreasonable risk" of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show "deliberate indifference to or tacit authorization of the alleged offensive practices,"; and (3) that there was an "affirmative causal link" between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

*Id.* at 799 (citations omitted). "As to the second element, a plaintiff 'may establish deliberate indifference by demonstrating a supervisor's continued inaction in the face of documented widespread abuses.'" *Wilkins v. Montgomery*, 751 F.3d 214, 226-27 (4th Cir. 2014) (quoting

*Shaw*, 13 F.3d at 799).

Arrests must be supported by probable cause to believe that the arrestee committed (or was committing) an offense. *See, e.g.*, *Gerstein v. Pugh*, 420 U.S. 103, 111 (1975). "To implement the Fourth Amendment's protection against unfounded invasions of liberty and privacy, the [Supreme] Court has required that the existence of probable cause be decided by a neutral and detached magistrate whenever possible." *Id.* at 112. When a police officer arrests someone without a warrant, however, only the officer has determined that probable cause exists. Therefore, the government must "promptly" arrange for the arrestee's presentment before a judicial officer for a probable cause assessment. *Id.* at 125. Presentment within 48 hours is presumptively constitutional, and an arrested individual presented to a judicial officer within that time bears the burden of showing "that his or her probable cause determination was delayed unreasonably." *Cnty. of Riverside v. McLaughlin*, 500 U.S. 44, 56 (1991). "Where an arrested individual does not receive a probable cause determination within 48 hours, . . . the burden shifts to the government to demonstrate the existence of a bona fide emergency or other extraordinary circumstance." *Id.* at 57.

Ms. Murphy concedes that the plaintiffs have put forth evidence sufficient to establish the first element of pervasive and unreasonable risk of constitutional injury. She argues, however, that a reasonable jury could not find that she was deliberately indifferent to delays in presentment, or that there was an affirmative causal link between her alleged inaction and the delays. The court agrees that no genuine dispute of material fact exists to support the element of deliberate indifference, and therefore will not reach the question of causation.

The foundation of Ms. Murphy's argument is that the undisputed evidence demonstrates

11

that delays in presentment of warrantless arrestees were due to problems largely out of her control, and that is why overdetentions persisted despite her efforts to prevent them.  As Central Booking's warden, Ms. Murphy was an employee of DPDS, a state agency, *see* Md. Code, Corr. Servs. § 5-404, and her immediate supervisor was DPDS's Deputy Commissioner (though DPSCS's Commissioner "signed off" on Central Booking's policies).  (Murphy Dep. at 256; Flanagan Dep. at 34).  Within Central Booking, she supervised other DPDS employees, including a chief of security, assistant wardens, majors, captains, sergeants, and correctional officers.  (Flanagan Dep. at 40-41.)  But Ms. Murphy is correct that the timely presentment of warrantless arrestees also involved many outside her supervision, including BPD officers, state's attorneys, and court commissioners, each of whom could be (and were) responsible for delays.

BPD officers caused delays in several ways.  Hours often passed between when a BPD officer arrested someone and when the arrestee was brought to Central Booking.  (Murphy Dep. at 273; Franks Dep. at 238; Smith Dep. at 150-51.)  BPD officers often were slow to complete a statement of probable cause, (Murphy Dep. at 286-87; Moss Dep. at 29; Booking Process Presentation at 15), failed to "lock" the statement or hit "send" so it could enter the computer system, (Smith Dep. at 150-51; Booking Process Presentation at 15), or were unable to complete the statement process because of broken "signature pads," (Booking Process Presentation at 15).  Though it was the responsibility of the police liaisons to contact the arresting officers for missing documents, (2005 DPDS Plan at 3-4), "the police liaisons initially did not feel that it was their responsibility to move quickly," (Franks Dep. at 239).  When statements of probable cause arrived at Central Booking, the police liaisons, whose responsibilities also included printing the statements and giving them to a state's attorney, sometimes refused to do so.  (Murphy Dep. at

290, 305.)[13]

State's attorneys were also frequently responsible for delays once they received the arresting officer's statement.  (Franks Dep. at 238-39; Flanagan Dep. at 52; Becketts Dep. at 96-97; *see also* OPD letter to Judge Glynn dated Oct. 31, 2005, Mot. Summ. J. Ex. 78, ECF No. 392-10, at 1 ("Our office, in reviewing those circumstances where an individual is close to or past the 24th hour mark, has observed that the majority of these cases involve a delay in the completion of the paperwork by either the Police Department and/or the State's Attorney's Office.").)  These delays were sometimes linked to the state's attorneys' activities in the war room.  (Becketts Dep. at 85; Murphy Dep. at 308-09.)

Even when an arrestee (and his paperwork) had been fully and timely processed, presentment was further delayed when the number of available court commissioners was insufficient, (Franks Dep. at 238; Smith Dep. at 153; Booking Process Presentation at 19), causing the available commissioners to be overwhelmed by the volume of arrestees, (Flanagan Dep. at 48; Smith Dep. at 153).

The undisputed evidence also makes clear that Ms. Murphy took various actions to prevent and reduce overdetentions.  First, she personally monitored the issue and sought to remedy potential delays as they arose: she used the ABS to monitor the lengths of arrestees' detentions in real time, (Murphy Dep. at 84), printed reports highlighting warrantless arrestees who had been detained for the longest periods of time to prioritize those individuals, (*id.* at 229), and when arrestees had been detained without presentment for more than 24 hours she went to

---

[13] Ms. Murphy's uncontradicted testimony indicated that police liaisons sometimes refused to refill the paper in their own printers, preventing the statements of probable cause from printing.  (Murphy Dep. at 290, 305.) If a member of Central Booking's staff "print[ed] it out for the police liaisons and t[ook] it to them so that they could give it to the State's attorney," some police liaisons "would just take what [the] lieutenants would bring to them and throw [it] in the trash."  (*Id.* at 305.)

the booking floor to "look[ ] for answers," (*id.* at 229-30; Dep. of James Shields, Mot. Summ. J.

Ex. 85, ECF No. 392-17, at 66).  Second, she focused her staff on the problem by issuing "post

orders" – documents describing the duties of a particular position, (Murphy Dep. at 125-26), –

for the booking lieutenant, (Mot. Summ. J. Ex. 82, ECF No. 392-14), the booking shift

commander, (Mot. Summ. J. Ex. 83, ECF No. 392-15), and the sergeant assigned to the position

of "arrest booking lead," (Mot. Summ. J. Ex. 84, ECF No. 392-16), that required these

individuals to monitor the booking queue and potential delays.  Third, she alerted her superiors

to the issue of delays in presentment.  She did this by writing a thorough memorandum to Deputy

Commissioner Howard Ray, her immediate supervisor, (Murphy Dep. at 255), addressing the

problem and its varied causes (Memo, Mot. Summ. J. Ex. 79, ECF No. 392-11), and by raising

the issue in Monday morning meetings with DPDS Commissioner William Smith, (Murphy Dep.

at 265-66).  Fourth, she worked with representatives of other agencies in Central Booking whose

activities were linked to delays: she had meetings with representatives of all the agencies with

operations in Central Booking to discuss the problem and work to resolve it, (Shields Dep. at 64-

66), met and spoke regularly with BPD officers about the issue, (Murphy Dep. at 309-12), and

had a long meeting about the issue with the then-commissioner of the BPD, (*id.* at 314).[14]

Under these circumstances, where the undisputed evidence establishes both that delays in

presentment were largely due to factors beyond Ms. Murphy's control, and Ms. Murphy took

various actions in her attempt to eliminate overdetentions, no reasonable jury could find that she

---

[14] Ms. Murphy attaches what she describes as a sample of booking records with "delay comments," and argues that it demonstrates both "the systemic problem of delays in the preparation or transmission of charging documents by allied agencies" and "the persistent efforts made by Central Booking officers to address this problem."  (Mot. Summ. J. at 16 (citing Mot. Summ. J. Ex. 81, ECF No. 392-13).)  The plaintiffs do not dispute that these booking records show that a high percentage of the delays arose from the unavailability of charging documents (for which BPD officers were responsible), or that Central Booking officers made repeated requests to the police liaisons for these documents.

was deliberately indifferent to the problem.  *See West v. Tillman*, 496 F.3d 1321, 1333 (11th Cir.
2007) (rejecting claims of deliberate indifference to overdetention where delays were caused by
issues outside the defendants' control and the defendants "undertook to address" the issues).
This case is not one where the supervisor's response to "documented widespread abuses" was
anything approaching "continued inaction."  *Wilkins*, 751 F.3d at 226 (citation and internal
quotation marks omitted).

The plaintiffs' arguments to the contrary fall into two main categories, the first of which
is that Ms. Murphy should have done more to speed the release of warrantless arrestees.
Specifically, they say she failed to take "a more pro-active approach," (Pls.' Resp. Mot. Summ.
J. at 14), "releas[e] minor offenders," (*id.* at 15), or seek "court permission to detain warrantless
arrestees beyond 48 hours without presentment," (*id.* at 20).  As to Ms. Murphy's supposed
failure to take a more pro-active approach, "[d]eliberate indifference is a very high standard,"
*Grayson v. Peed*, 195 F.3d 692, 695 (4th Cir. 1999), and "[a] 'showing of mere negligence' will
not suffice," *Danser v. Stansberry*, 772 F.3d 340, 347 (4th Cir. 2014) (citing *id.*).  Even if Ms.
Murphy's actions (or failures to act) could be characterized as negligent, they do not approach
deliberate indifference.[15]  As to the plaintiffs' suggestion that she should have released "minor"
offenders, the plaintiffs fail to explain how Ms. Murphy should have unilaterally determined
which individuals were arrested for offenses sufficiently "minor" to justify their release.  They
also fail to adequately address the fact that DPDS Commissioner William Smith, apparently
reversing an earlier policy that allowed releases in exceptional circumstances, specifically

---

[15] The plaintiffs also argue that because Ms. Murphy testified in her deposition that she was unaware of the
constitution's 48-hour limit on detention, (Murphy Dep. at 219), she cannot now argue that she did anything to avoid
detentions beyond 48 hours.  Not so.  Ms. Murphy made clear that, in accordance with Maryland law, she focused
on reducing the length of detentions to less than 24 hours.  Her knowledge of the less stringent constitutional limit is
irrelevant.

instructed Ms. Murphy not to release overdetained individuals.  (Smith Dep. at 156, 201-02; Murphy Dep. at 58, 216, 233, 256-60.)  And as to Ms. Murphy's failure to seek court permission, the plaintiffs do not explain how Ms. Murphy could have done so before the court in *Rodney v. Murphy* issued its TRO on April 25, 2005 – just two months before Ms. Murphy's time as Central Booking's warden ended.  Nor do they explain how *Rodney*'s case-by-case remedy could have addressed the systemic, inter-agency problems underlying delays.  In short, Ms. Murphy cannot be held deliberately indifferent simply because she did not take the remedial actions of the plaintiffs' choosing.

The plaintiffs' second argument is that Ms. Murphy is automatically liable for overdetentions that occurred while she was warden, either because she was the arrestees' "custodian," (Pls.' Resp. Mot. Summ. J. at 17-20), or because she was Central Booking's "final policymaker," (*id.* at 21).  The "custodian" theory might reasonably be applied where the municipality itself may be fairly characterized as an arrestee's custodian.  *See Bernard v. City of Palo Alto*, 699 F.2d 1023, 1027 (9th Cir. 1983) ("*The County* is responsible for operating the jail and has custody over arrestees.") (emphasis added).  The same may be true for a particular agency, such as a police department.  *See Wayland v. City of Springdale*, 933 F.2d 668, 670 (8th Cir. 1991) (where officials were sued in both their official and individual capacities, stating that "*the police* were under no obligation to continue to hold" an overdetained arrestee) (emphasis added).  But it does not make sense to apply that theory where, as here, the plaintiffs seek money damages from a state official, sued in her individual capacity, in a context where processing of warrantless arrestees involved a mix of officials both state (e.g., Central Booking officers) and local (e.g., BPD officers).  The plaintiffs' characterization of Ms. Murphy as Central Booking's

16

custodian would evade the applicable standard of deliberate indifference.  The "final

policymaker" theory fails for similar reasons: though it fits within a municipal liability theory, its

application here would turn supervisory liability into *respondeat superior*.  And in any event,

there is no evidence that a policy adopted by Ms. Murphy was responsible for Central Booking's

overdetention issues.  *See Powell v. Sheriff, Fulton Cnty. Ga.*, 511 F. App'x 957, 962-63 (11th

Cir. 2013) (holding that the plaintiffs failed to show deliberate indifference to their overdetention

because delays arose from "various factors outside [the sheriff's] control," not "any custom or

policy" the sheriff had adopted),[16] *cert. denied sub nom. Matkin v. Barett*, 134 S. Ct. 513 (2013).

**Qualified Immunity**

In the alternative, Ms. Murphy also argues that she is protected by qualified immunity.

At the summary judgment stage, qualified immunity shields federal and state officials from

money damages unless a plaintiff offers evidence from which a jury could reasonably conclude

"(1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly

established' at the time of the challenged conduct."  *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2080

(2011).  "A Government official's conduct violates clearly established law when, at the time of

the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable

official would have understood that what he is doing violates that right.'"  *Id.* at 2083 (citation

omitted).  "In the end, the lodestar for whether a right was clearly established is whether the law

'gave the officials "fair warning" that their conduct was unconstitutional.'"  *Iko v. Shreve*, 535

F.3d 225, 238 (4th Cir. 2008) (citation omitted).

Ms. Murphy argues that she is entitled to qualified immunity because, among other

reasons, a reasonable official in her position would not have believed she was authorized to act

---

[16] Unpublished cases are cited not as precedent but for the soundness of their reasoning.

unilaterally to release arrestees who had not been timely presented to a court commissioner.  The

plaintiffs' failure to address this argument suggests they have abandoned arguments to the

contrary.  *See Mentch v. E. Sav. Bank, FSB*, 949 F. Supp. 1236, 1247 (D. Md. 1997) (holding

that failure to address the defendant's arguments for summary judgment in an opposition brief

constituted abandonment of the claim).  Regardless, however, Ms. Murphy is correct that she is

entitled to qualified immunity.  Even assuming that Ms. Murphy's conduct was unconstitutional,

the plaintiffs have cited no authority from the Supreme Court, the Fourth Circuit, or the Court of

Appeals of Maryland clearly establishing that a warden in Ms. Murphy's position would violate

an arrestee's constitutional rights by not taking the remedial actions the plaintiffs suggest could

have alleviated Central Booking's overdetention problem.  "Officials are not liable for bad

guesses in gray areas; they are liable for transgressing bright lines."  *Maciariello v. Sumner,* 973

F.2d 295, 298 (4th Cir. 1992).  The issues facing Central Booking – with its mix of state and

local agencies, several of which were responsible for delays in presentment of warrantless

arrestees – constituted a gray area, and Ms. Murphy's failure to unilaterally release overdetained

individuals or seek judicial permission to prolong their detention crossed no bright lines.  She

thus had no "fair warning" that her conduct was unconstitutional, and is entitled to qualified

immunity.

Accordingly, the court will grant Ms. Murphy's motion for summary judgment.

## CONCLUSION

For the reasons stated above, the defendants' motion to alter class periods will be granted

to the extent it seeks to limit the overdetention class to Ms. Murphy's tenure as warden, and

denied as moot in all other respects.  Ms. Murphy's motion for summary judgment will be

granted.  The following motions will be denied as moot: the plaintiffs' motion for relief concerning the court's April 15, 2010 order, the plaintiffs' motion to strike a late document, the plaintiffs' motion to depose Glenn Marrow, and the plaintiffs' emergency motion to withdraw their combined opposition.

A separate order follows.


<u>February 24, 2015</u>                              _____/S/_____
Date                                                        Catherine C. Blake
                                                           United States District Judge


19